

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**ENTERED**
**07/15/2008**

| | | |
|---|---|---|
| IN RE: | § | |
| **IFS FINANCIAL CORPORATION** | § | **CASE NO: 02-39553** |
|     Debtor | § | |
| | § | **CHAPTER 7** |
| | § | |
| **W. STEVE SMITH, TRUSTEE** | § | |
|     Plaintiff | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 04-3789** |
| | § | **ADVERSARY NO. 04-3824** |
| **GONZALO ROMERO MATIAS,** *et al* | § | **ADVERSARY NO. 04-3845** |
|     Defendant(s) | § | |

## <u>AMENDED MEMORANDUM OPINION</u>

For the reasons set forth below, the Court holds that the Court has personal jurisdiction over defendants Gonzalo Romero Matias ("Romero"), Minerva Bienes Racies, S.A. DE C.V. ("Minerva"), Mar Sur, S.A. DE C.V. ("Mar Sur"), South Sea Corp. ("South Sea"), North Sea Corp. ("North Sea"), Pacific Coast Investments ("Pacific"), and Larce, Inc. ("Larce"). For the reasons set forth below, the Court holds that the Court does not have personal jurisdiction over defendants Grupo Inmobiliario De Tijuana, S.A. DE C.V. ("Grupo"), Palatina S.A. DE C.V. ("Palatina"), and Flaminia, S.A. DE C.V. ("Flaminia"). The Court grants Defendants' motion to dismiss with respect to defendants Grupo, Palatina, and Flaminia and denies Defendants' motion to dismiss with respect to the remaining Defendants.

### Summary

The IFS Financial Corporation ("IFS") case is a jointly administered case comprised of approximately 19 related entities (the "Interamericas Companies").[1] Under the jointly

---

[1] An involuntary petition was filed against each of these entities on approximately August 23, 2002. The Court entered an order on January 3, 2005, jointly administering these cases under a single docket. The relationship

administered case, W. Steve Smith, Trustee, has filed over 100 adversary proceedings. The Trustee filed the present adversary on October 10, 2004.[2]

Defendant Romero is a shareholder in some of these related entities. Between 1998 and 2002, millions of dollars were transferred out of the Debtor and related entities to various alleged insiders. The Trustee alleges that these transfers were fraudulent transfers and defrauded and denuded the Interamericas Companies. The Trustee contends that Romero effectuated and received such transfers and seeks to recover the transfers under various legal theories.

**Jurisdiction and Venue**

This Court has jurisdiction of this matter under 28 U.S.C. § 1334. Venue is proper in this District pursuant to 28 U.S.C. §1409.

**Background**

IFS is part of the Interamericas Companies. The Interamericas Companies are comprised of Interamericas, Ltd., Interamericas Investments, Ltd., Interamericas Holdings, Inc., Interamericas Corporation, Interamericas Financial Holdings, Ltd., Interamericas Financial Holdings Corp., IFS, and other related entities (the "Interamericas Companies"). The Interamericas Companies received money, primarily from Mexican investors, in exchange for future payments to be made from the operation of Interamericas Companies' various businesses.[3] Decisions concerning the operations of the Interamericas Companies were generally made by an

---

between these various entities is complex. The Trustee sets forth an overview of the alleged "Interamericas Corporate Structure" in his amended complaint [docket no. 53].

[2] The Trustee's complaint names the following defendants: Gonzalo Romero Matias, Minerva Bienes Racies, S.A. de C.V., Mar Sur, S.A. de C.V., South Sea Corp., Larce, Inc., North Sea Corp., Pacific Coast Investments, Grupo Inmobiliaro de Tijuana, S.A. de C.V., Palatina S.A. de C.V., and Flaminia, S.A. de C.V.

[3] The Interamericas Companies' businesses included the mortgage, banking, insurance, real estate, custom brokerage and transport forwarding, money exchange, construction/development and food industries.

Advisory Board, consisting primarily of Hugo Pimienta, Arturo Pimienta, Enrique Pimienta, Rodolfo Garcia, and Peter Ulrich.

Between 1998 and 2002, the assets of the Interamericas Companies, including IFS, were transferred between various IFS entities and ultimately transferred outside the companies.  The Trustee alleges that most transfers went to insiders by way of the Interamericas Companies' bank accounts at Southwest Bank of Texas and Woodforest Bank.  The Trustee alleges Romero, as a member of the Interamericas Companies' management team and as a major owner of IFS and other related entities, helped effectuate the transfers.  The Trustee also contends that Romero received some of the disputed transfers, amounting to tens of millions of dollars.  Romero may have received some of the transfers directly, but most are alleged to have occurred through the corporate Defendants.  The Trustee characterizes the corporate Defendants as "shell," "sham" entities established solely as investment vehicles for Romero.  The transfers form the basis of the Trustee's fraud, denuding, and fraudulent transfer claims against Defendants.

On December 15, 2005, defendants Romero, Minerva, Mar Sur, and Grupo filed a motion to dismiss for lack of personal jurisdiction, and alternatively sought dismissal on other grounds.

### Joint Trial

On April 24, 2006, the Court bifurcated consideration of the issues and scheduled a trial limited solely to the issue of whether the Court has personal jurisdiction over Defendants.  On November 6, 7, and 8, 2006, the Court conducted a trial on the issue of personal jurisdiction. The trial was jointly conducted in adversary proceedings 04-3789, 04-3824, and 04-3845.

### Reconsideration

On September 11, 2007, the Court issued its Memorandum Opinion on Defendants' motion to dismiss for lack of personal jurisdiction.  The Court found personal jurisdiction over

defendants Romero Matias ("Romero), Minerva Bienes Racies, S.A. DE C.V. ("Minerva"), Mar

Sur, S.A. DE C.V. ("Mar Sur"), South Sea Corp. ("South Sea"), North Sea Corp. ("North Sea"),

Pacific Coast Investments ("Pacific"), and Larce, Inc. ("Larce").   The Court found no personal

jurisdiction over defendants Grupo Inmobiliaro De Tijuana, S.A. DE C.V. ("Grupo"), Palatina

S.A. DE C.V. ("Palatina"), and Flaminia, S.A. DE C.V. ("Flaminia").   Defendants Grupo,

Palatina, and Flaminia were dismissed.

On November 15, 2007, defendants Romero and Minerva timely filed a motion for

reconsideration.  On January 29, 2008, the Court heard oral arguments on Defendants' motion.

The Court has carefully considered the parties' motions and oral arguments and amended its

September 11 Opinion in light of issues raised.  However, the Court's original orders granting

and denying the motion to dismiss require no amendments.

### Burden of Proof

The Plaintiff, as the party invoking the jurisdiction of the Court, bears the burden of

establishing that the Court has jurisdiction over the Defendants. *Seiferth v. Helicopteros*

*Atuneros, Inc.*, 472 F.3d 266, 270 (5th Cir. 2006); *Guidry v. U.S. Tobacco Co.,* 188 F.3d 619,

625 (5th Cir. 1999). Initially, at the pre-evidentiary hearing stage in a case, a plaintiff need only

make a prima facie or threshold showing of jurisdiction. *Alpine View Co. v. Atlas Copco AB*, 205

F.3d 208, 215 (5th Cir. 2000); *Guidry*, 188 F.3d at 625. All factual conflicts are resolved in the

plaintiff's favor. *Id.* Ultimately, however, the plaintiff must prove by a preponderance of the

evidence at a pretrial evidentiary hearing or at trial that the requisite jurisdictional facts exist.

*Brown v. Slenker*, 220 F.3d 411, 419 (5th Cir. 2000); *DeMelo v. Toche Marine, Inc.*, 711 F.2d

1260, 1270-71, n.12 (5th Cir. 1983).

In this case, the Court held a bifurcated trial on the issue of personal jurisdiction. Consequently, the Plaintiff bears the burden of proof by a preponderance of the evidence.

## Applicable Law

The sole issue presently before the Court is whether the Court should exercise personal jurisdiction over the Defendants.

Personal jurisdiction analysis first requires the court to consider whether a federal statute or rule defines the extent of the court's personal jurisdiction. *Federalpha Steel LLC Creditors Trust v. Fed. Pipe & Steel Corp. (In re Federalpha Steel LLC)*, 341 B.R. 872, 887 (Bankr. N.D. Ill. 2006) (citing *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1177 (9th Cir. 2004)). Federal Bankruptcy Rule 7004(f) defines personal jurisdiction over defendants in an adversary proceeding pending before a bankruptcy court. *In re Teknek, LLC*, 354 B.R. 181, 191. Rule 7004(f) authorizes personal jurisdiction to the extent allowed by the Fifth Amendment Due Process clause. *In re Teknek, LLC*, 354 B.R. at 192 (citing *Enron Corp. v. Arora (In re Enron Corp.)*, 316 B.R. 434, 440, 442, 444–46 and n. 8 (Bankr. S.D. N.Y. 2004); *In re Federalpha Steel LLC*, 341 B.R. at 884; *North v. Winterthur Assurances (In re North)*, 279 B.R. 845, 851–53 (Bankr. D. Ariz. 2002). Consequently, a bankruptcy court's personal jurisdiction is not affected by a state's long-arm statute or constitution. *In re Teknek, LLC*, 354 B.R. at 193.

The Due Process Clause permits the exercise of personal jurisdiction over a nonresident defendant when: (1) the defendant has "minimum contacts" with the forum; and (2) the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 813 (5th Cir. 2006). "Minimum contacts" are required to preserve a defendant's Due Process right not to be haled

into a forum without "fair warning" that prior conduct subjected them to that forum's jurisdiction. *Burger King Corp.*, 471 U.S. at 471–72. The plaintiff bears the burden of establishing "minimum contacts." *Seiferth*, 472 F.3d at 271 . If successful, the burden shifts to the defendant to establish that the exercise of jurisdiction would be unfair or unreasonable. *Id.*

With one exception, the "minimum-contacts" analysis used in diversity cases is also applied to a foreign defendant in bankruptcy court adversary proceedings based on federal law. Generally, "minimum contacts" analysis looks only at the defendant's contacts within the forum state. When the defendant is a foreign citizen haled before a bankruptcy court within an adversary proceeding based on federal law, courts aggregate the defendant's contacts within the *entire* United States. *In re Teknek*, 354 B.R. at 192. *See also Application to Enforce Admin. Subpoenas Duces Tecum of S.E.C. v. Knowles*, 87 F.3d 413, 417 (10th Cir. 1996) ("When the personal jurisdiction of a federal court is invoked based upon a federal statute providing for nationwide or worldwide service, the relevant inquiry is whether the respondent has had sufficient minimum contacts with the United States."); *United States v. De Ortiz*, 910 F.2d 376, 382 (7th Cir. 1990). "To satisfy due process, then, a defendant . . . need have only minimum 'national contacts.'" *In re Federalpha Steel LLC*, 341 B.R. at 888 (quoting *United Rope Distribs., Inc. v. Seatriumph Marine Corp.*, 930 F.2d 532, 534 (7th Cir. 1991)).

Courts have not crafted a neat, mechanical formula for defining the required "minimum contacts." Indeed, the Supreme Court has specifically repudiated a mechanical approach. *Burger King Corp.*, 471 U.S. at 485–86 (rejecting "talismanic jurisdictional formulas" for personal jurisdiction analysis). However, generally, personal jurisdiction exists if a defendant intentionally engages in conduct within or affecting the forum state and the conduct was significant enough that the defendant should not be surprised to have the consequences of his

conduct adjudicated within the forum state's courts.  The Supreme Court has stated that the contacts must be "purposeful" as opposed to "fortuitous" or "attenuated," and the contacts must be significant enough that a reasonable person would foresee that their "conduct and connection with the forum State are such that he should reasonably anticipate being haled into the court there." *Burger King Corp.*, 471 U.S. at 474 (quoting *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297, 299 (1980)). *See also* MOORE'S FEDERAL PRACTICE, § 108.42[3][b][i] (3d. ed. 2007) ("intentionally causing an effect in the forum state constitutes purposeful availment") (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)).

A defendant's "minimum contacts" may give rise to either general personal jurisdiction or specific personal jurisdiction.  A court with general jurisdiction over a non-forum defendant has jurisdiction to adjudicate any claim against that defendant, including claims that do not arise in the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.9 (1984).  A court may exercise general jurisdiction over any action brought against a defendant if the defendant's contacts with the forum state are "continuous and systematic."  *Seiferth*, 472 F.3d at 271. When examining a general personal jurisdiction issue, courts consider the defendant's contacts occurring within the forum "over a reasonable number of years, up to the date the suit was filed." *Access Telecom, Inc., v. MCI Telecomm. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999) (citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 569 (2d Cir. 1996)).

Absent general personal jurisdiction, the Court may still exercise limited specific personal jurisdiction over a defendant when a defendant's contacts with the forum location arise from, or are directly related to, the cause of action. *Burger King Corp.*, 471 U.S. at 472–73. Unlike general personal jurisdiction, specific personal jurisdiction does not extend to any claim

against the non-forum defendant.  Specific personal jurisdiction is limited to causes of action that arise from conduct that occurred in or was directed to the forum location. *Burger King Corp.*, 471 U.S. at 473 n. 15.

### Analysis

In order for the Court to exercise personal jurisdiction over Defendants, the Trustee must establish that Defendants' contacts with the forum support either general or specific jurisdiction. The Trustee contends that this Court has general and specific personal jurisdiction over Defendants based on their involvement with the Interamericas Companies.  The Interamericas Companies included Texas corporations, were governed by an Advisory board that met in Texas, effectuated most receipt and payment of funds through Texas bank accounts, and had registered agents and offices in Texas.  The Defendants' alleged involvement with the Interamericas Companies included investment in Interamericas Companies' entities, control over the Interamericas Companies' structure, participation in the defrauding and denuding of the Interamericas Companies, and receipt of fraudulent transfers from the Interamericas Companies.

The Court holds that the Court has personal jurisdiction over defendants Minerva, Mar Sur, South Sea, Pacific, Larce, and North Sea based upon their direct consent to personal jurisdiction in this forum.  The above corporate defendants all signed agreements with forum-selection clauses providing for personal jurisdiction in this forum.  The Court holds that the Court has personal jurisdiction over defendant Romero primarily based upon his principal-agent relationship with an Advisory Board member of the IFS Companies.  The Court analyzes the personal jurisdiction issue with respect to the corporate Defendants and Romero separately.  The Court first describes the corporate Defendants' and Romero's contacts with Texas, and then

considers whether those contacts are sufficient for this Court to exercise general or specific personal jurisdiction.

### A. Contacts

#### 1. Corporate Defendants

The Trustee contends that this Court has general and specific personal jurisdiction over nine corporate entities in which Romero had a majority or 100% ownership interest. Four of the corporate entities (South Sea, Pacific, North Sea, and Larce) were created by the Interamericas Companies' general counsel. The Trustee alleges that the corporations were "sham," "shell" corporations created by the Interamericas Companies to serve as investment vehicles through which Romero could receive funds from the Interamericas Companies. The entities' sole assets were loans acquired from the Interamericas Companies' insurance corporations. Moreover, all principal and interest payments were made by the Interamericas Companies through the Interamericas Companies' Texas bank accounts. The Trustee's allegations of fraudulent transfers, fraud, denuding, and conversion all arise from these loans and the payments made on the loans by the Interamericas Companies. Neither Romero nor any of the corporate Defendants appear to have ever made a payment on the loans. Of particular importance for the personal jurisdiction issue, the loan agreements contained forum-selection clauses explicitly consenting to Texas court jurisdiction.

**South Sea.** The Trustee has proven, by a preponderance of the evidence, the following allegations with respect to South Sea's contacts with Texas and the United States:

• South Sea was formed by the Interamericas Companies' general counsel for the purpose of allowing South Sea to transact business with the Interamericas Companies on behalf of Romero or Romero's Mexican businesses.

• South Sea executed a loan restructuring agreement in which South Sea consented to Texas and United States jurisdiction. In 1999, South Sea, Mar Sur (a

Mexican corporation in which Romero held a majority interest), and AFL (an Interamericas Companies entity) executed a loan restructuring agreement.  The agreement provided that: "For everything related to this Agreement, the Parties expressly submit to the *federal competent courts of the State of Texas* and to the competent courts of the United Mexican States *at the election of AFL*, expressly waiving any other jurisdiction that may correspond to the parties by virtue of their present or future domiciles."  The Trustee has elected a Texas forum by filing a complaint in this Court.[4]

● South Sea received funds drawn upon a Texas bank account.  Pursuant to various promissory notes with South Sea, AFL transferred over $10,000,000 to a Texas bank account.  The account was owned by INV Capital Limited, an Interamericas Companies entity.  The account plays a substantial role in this dispute because the Trustee alleges that (i) INV held the principal amount for the benefit of South Sea; and (ii) South Sea received the "loans" from this account.

**Pacific.**  The Trustee has proven, by a preponderance of the evidence, the following allegations with respect to Pacific's contacts with Texas and the United States:

● Pacific was formed by the Interamericas Companies' general counsel for the purpose of allowing Pacific to transact business with the Interamericas Companies on behalf of Romero or Romero's Mexican businesses.

● Pacific executed a promissory note in Texas, in which Pacific consented to the application of Texas law.  On December 3, 1998, Pacific executed a $5,000,000 promissory note in favor of Bradford National Life Insurance Company (an Interamericas Companies entity).  The promissory note states: "This Note and all instruments, documents, and other writings evidencing, securing, or pertaining to the indebtedness evidenced hereby have been delivered in the State of Texas and shall be construed in accordance with and governed by the applicable laws of the United States of America and the applicable laws of the State of Texas . . ."  The note also stated that Pacific "agrees and consents to all of the terms, provisions, agreements, assignments and other writings now or hereafter securing or pertaining to the loan evidenced by this Note."

**Larce.**  The Trustee has proven, by a preponderance of the evidence, the following allegations with respect to Larce's contacts with Texas and the United States:

● Larce was formed by the Interamericas Companies' general counsel for the purpose of allowing Larce to transact business with the Interamericas Companies on behalf of Grupo.

---

[4] A copy of the restructuring agreement was not admitted into evidence because a signature was missing.  However, the Court did hear testimony with respect to the restructuring agreement and admitted a resolution signed by South Sea and Mar Sur approving all provisions of the restructuring agreement.

● Larce executed a promissory note in which Larce consented to Texas and United States jurisdiction.  In late 1999, Larce executed a promissory note in the amount of $5,430,127.40 in favor of AFL.  The promissory note contained a forum-selection clause stating: "For everything related to this Promissory Note, the Maker and the Holder hereby *expressly submit themselves to the jurisdiction of the federal courts of the Southern District of the State of Texas, Houston* Division or to the competent courts of the City of Mexico, Federal District, United Mexican States, *at the election of the Holder* thereof, expressly waiving any other jurisdiction that may correspond to them by virtue of their present or future domiciles, or any other reason."

● Larce executed a September 30, 1999 loan restructuring agreement consenting to Texas and United States jurisdiction.  In February of 2002, Larce, Minerva (a Mexican corporation), and AFL entered a restructuring agreement on Larce's 1999 promissory note.  The agreement contained a forum-selection clause identical to the clause contained in the South Sea restructuring agreement.

**North Sea.** The Trustee has proven, by a preponderance of the evidence, the following allegations with respect to North Sea's contacts with Texas and the United States:

● North Sea was formed by the Interamericas Companies' general counsel for the purpose of allowing North Sea to transact business with the Interamericas Companies on behalf of major investors.

● North Sea executed a promissory note in Texas, in which North Sea consented to apply Texas law.  On June 22, 1999, North Sea executed a promissory note in the amount of $5,000,000 in favor of AFL.  The Promissory note stated that payments were to be made to the Interamericas Companies' main Texas address.  The note also contained a choice-of-law clause stating: "This promissory note, and all instruments, documents and other writings evidencing, securing or pertaining to the indebtedness evidenced hereby have been delivered in Harris County, Texas, and shall be construed in accordance with and governed by the applicable laws of the United States of America and the applicable laws of the State of Texas . . . "

● A security agreement consenting to Texas jurisdiction for certain activities and to the application of Texas law.  On June 22, 1999, North Sea, AFL, and Romero executed a security agreement whereby Romero pledged a $5,300,000 promissory note executed in his favor.  The $5,300,000 note was pledged to Romero from Palatina (a Mexican corporation) and secured by stock of a company called Flaminia (a Mexican corporation).  The security agreement contained four provisions that the Trustee alleges are relevant to jurisdiction:

11

(1) Interest was to be determined "by the applicable law of the United States of America or the State of Texas."

(2) Rights and remedies were to be determined by "the Uniform Commercial Code in force in the State of Texas."

(3) Sale of the collateral would be commercially reasonable if "notice of such sale [was provided] at the Montgomery County Courthouse in Montgomery County, Texas . . ." and notice was sent to "persons legally entitled thereto under the Uniform Commercial Code of Texas . . ." The Agreement also provided that "no sale shall be required to be held outside of Montgomery County, Texas . . ."

(4) Terms used in the security agreement were to be defined according to the Texas Uniform Commercial Code.

(5) The agreement was to be governed by the law "of the State of Texas."

**Mar Sur.** The Trustee has proven, by a preponderance of the evidence, the following allegations with respect to contacts that Mar Sur had with Texas and the United States:

● Mar Sur's stock secured South Sea's 1999 promissory note.  Mar Sur is a Mexican corporation.  Romero is a majority owner of Mar Sur.

● Mar Sur executed a 1999 loan restructuring agreement between South Sea, Mar Sur, and AFL in which Mar Sur consented to Texas and United States jurisdiction. Specifically, the agreement provided: "For everything related to this Agreement, the Parties ***expressly submit to the federal competent courts of the State of Texas*** and to the competent courts of the United Mexican States ***at the election of AFL***, expressly waiving any other jurisdiction that may correspond to the parties by virtue of their present or future domiciles."  The Trustee has elected a Texas forum by filing a complaint in this Court.

**Minerva.** The Trustee has proven, by a preponderance of the evidence, the following allegations with respect to Minerva's contacts with Texas and the United States:

● Minerva's stock secured Larce's 1999 promissory note.  Minerva is a Mexican corporation.

● Minerva executed a 1999 restructuring agreement between Larce, AFL, and Minerva in which Minerva consented to Texas and United States jurisdiction.

The Trustee's complaint lists three additional corporate defendants that were owned by Romero (Grupo,  Palatina, and Flamina).  The Trustee contends that this Court has general and specific personal jurisdiction over these corporate Defendants based on financial transactions entered into with the Interamericas Companies, participation in the defrauding and denuding of the Interamericas Companies, and as beneficiaries of fraudulent transfers made by the Interamericas Companies' Advisory Board.

**Grupo.** The Trustee alleges that Grupo had the following contacts with Texas and the United States:

> ● Receipt of a fraudulent transfer.  MP Corporation was a Texas corporation owned by the IFS structure.  MP owned approximately 31% of Grupo (a Mexican entity).  Romero owned the remainder.  In late 2001, the Trustee alleges that MP granted power of attorney over its interest in Grupo to Romero's representative of Minerva and Romero's children.  The Trustee alleges that the grant of power of attorney effectively granted Romero MP's interest in Grupo and constituted a fraudulent transfer, as well as participation in the fraud and denuding of the Interamericas Companies.

**Palatina.** Palatina's ties to Texas are limited to its participation in the 1999 security agreement between North Sea and AFL.

**Flaminia.** Flaminia's ties to Texas are also limited to its participation in the 1999 security agreement between North Sea and AFL

### *2. Romero*

The Trustee has proven, by a preponderance of the evidence, the following allegations with respect to Romero's contacts with Texas and the United States:

> ● Romero had substantial investments within the Interamericas Companies.  The evidence suggested that Romero invested up to $80 million dollars in the Interamericas Companies.  Romero's initial investment made him a majority shareholder, and Romero made subsequent investments throughout the 1990's to retain his majority position.

● Romero granted power of attorney to Enrique Pimienta, an Interamericas Companies' Advisory Board member.  The Trustee and Romero dispute when the power of attorney was created, the scope of that power, and when the power was terminated.  Although the Court reserves a portion of that dispute for the final trial, the Trustee proved by a preponderance of the evidence that a power of attorney agreement was in place during the period relevant to the Trustee's claims.

● Enrique was Romero's agent.  The power of attorney agreement and Enrique's frequent receipt and execution of Romero's orders created an agency relationship under general agency principals.

● Romero made business and social trips to Texas and other states.

● Romero made telephone communications with Hugo and Enrique Pimienta concerning Interamericas Companies' business.

● Romero received payments from the Interamericas Companies.  The record indicated that Romero received numerous payments from the Interamericas Companies, including a $1 million kidnap ransom, and $15,000 yearly salary paid for several years.  Most, if not all, of these funds were paid from a Texas bank account owned by the Interamericas Companies.

● Romero executed a security agreement consenting to the application of Texas law and to certain transactions in Texas.  On June 22, 1999, North Sea, AFL, and Romero executed a security agreement whereby Romero pledged a $5,300,000 promissory note executed in his favor.  The $5,300,000 note was pledged to Romero from Palatina (a Mexican corporation) and secured by stock of a company called Flaminia (a Mexican corporation).  The security agreement contained four separate provisions that the Trustee alleges relate to jurisdiction:

> (1) Interest was to be determined "by the applicable law of the United States of America or the State of Texas."

> (2) Rights and remedies were to be determined by "the Uniform Commercial Code in force in the State of Texas."

> (3) Sale of the collateral would be commercially reasonable if "notice of such sale [was provided] at the Montgomery County Courthouse in Montgomery County, Texas . . . " and notice was sent to "persons legally entitled thereto under the Uniform Commercial Code of Texas . . ." The Agreement also provided that "no sale shall be required to be held outside of Montgomery County, Texas . . ."

> (4) Terms used in the security agreement were to be defined according to the Texas Uniform Commercial Code.

14

(5) The agreement was to be governed by the law "of the State of Texas."

**B. Jurisdiction**

### 1. Corporate Defendants

The Supreme Court has stated that "[b]ecause the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703–704 (1982); *Burger King Corp.*, 471 U.S. at 473 n. 14. The right can be waived by contractual provisions that "submit to the jurisdiction of a given court." *Insurance Corp. of Ireland, Ltd.*, 456 U.S. at 703–04 (quoting *Nat'l. Equip. Rental, Ltd. v. Szukhent* (1964)).

Three conditions must be met before a forum-selection clause can be enforced. First, the clause must have been "reasonably communicated to the parties." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006). Second, the clause may not be the product of "fraud or overreaching." *Id.* (citing *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). Third, enforcement of the clause must not be "unreasonable and unjust." *Id.*

South Sea, Larce, Mar Sur, and Minerva all entered into promissory notes and/or security agreements and/or restructuring agreements that explicitly stated that Texas law and Texas courts would or could govern any disputes arising out of the agreements. The forum-selection clauses were all clearly printed and accessible. Defendants do not contend that any of the agreements or provisions within the agreements were induced by overreaching. With the exception of Minerva, Defendants do not contend that the agreements were induced by fraud. As the Court discusses later in the opinion, enforcement is not unfair or unjust. By signing notes and security agreements with such forum-selection clauses, defendants South Sea, Larce, Mar Sur, and Minerva effectively consented to United States jurisdiction. At the very least, Defendants can

not reasonably argue that it was "unforeseeable" that they would have to litigate their rights and obligations under agreements that explicitly provide for a Texas forum.

Nevertheless, Defendants contend personal jurisdiction over Mar Sur and Minerva can not be based on the loan documents signed by Mar Sur and Minerva. Within the loan documents, Mar Sur and Minerva pledged Mar Sur and Minerva stock. Defendants contend that corporations can not pledge their own stock. Rather, only the shareholders can pledge the stock. That is a substantive issue not related to the question of personal jurisdiction. Mar Sur and Minerva consented to jurisdiction in the United States. If there is a substantive defense to the agreements, then the substantive defense should be presented to this Court. The Court declines to base its jurisdictional determination on a substantive defense asserted to an agreement that—on its face—contains a consent to jurisdiction.

Minerva also contends that Romero's signature (as Minerva's representative) was forged on the 1999 restructuring agreement. Laura Palmer Mena (an employee of Romero) testified that the signature was not Romero's. Mena's opinion was based on the underscore underlining the signature. The underscore is more sloped than in other Romero signatures.

The Court discerns no signs of forgery. Mena's forgery assertion was made after Mena initially stated that "I'm not sure" whether or not the signature was Romero's. Though the underscore may be more sloped in one signature compared to others, there are no other discernable differences in the signature. Mena did not indicate any other differences or offer any other basis for her assertion that the signature was forged. The parties submitted numerous documents containing Romero's signature. The signature on the Larce restructuring agreement is substantially similar to the signatures on other documents. Signatures are never exactly the same. A slight difference in the incline of an underscore, noticed only by an equivocating

witness and with no other evidence that a forgery has occurred, does not support finding that the signature was forged.

Though the Trustee submitted evidence of restructuring and security agreements entered into by Pacific and North Sea and consenting to Texas and United States jurisdiction, the Court did not admit the agreements.  Pacific and North Sea did receive "loans" from Interamericas Companies' entities and Texas bank accounts.  The loan agreements were delivered in Texas and provided that Texas law would govern the agreements.  However, receipt of funds from a Texas entity or Texas bank account, without more, is insufficient to establish personal jurisdiction.  The loans may have been fraudulent transfers.  The Trustee has suggested that Pacific and North Sea did not have assets independent of the loans and never made payments on the loans.  However, the Court has not yet held a trial on the merits of the Trustee's claims and the Trustee has not otherwise sufficiently met his burden on the merits.[5]

Nevertheless, the Court concludes that personal jurisdiction exists over North Sea and Pacific.  It is undisputed that these two corporations were formed by the Interamericas Companies' general counsel.  It is also undisputed that the two corporations were formed for the purpose of giving major investors, including Romero and Mar Sur, an investment vehicle with the Interamericas Companies.  The issue before the Court is whether it is reasonable for these two corporations to be haled into court in the United States in a lawsuit seeking to avoid transfers to those corporations by the Interamericas Companies.  Because the central issue in the litigation against these entities arises from the kernel of their creation, the Court finds that it is reasonable for these two corporations to be haled into a United States court on that issue.

_____

[5] The Court is not ruling on whether the Trustee will prevail on his corporate veil piercing claim against Romero as the owner of the dismissed entities.  If the Trustee prevails on the merits and proves that Romero and a dismissed defendant are alter egos, Romero could be held liable for a fraudulent conveyance ostensibly made to a dismissed alter-ego defendant.

The Trustee has not met his burden for establishing personal jurisdiction over Grupo, Palatina and Flamina.  These Defendants did not sign a loan document consenting to Texas jurisdiction or take other action that reasonably subjects them to being haled into a United States Court.

Grupo was a Mexican, not a Texas corporation.  Grupo's only tie with Texas was past ownership by MP Corporation (a Texas corporation and part of the Interamericas Companies).  The Trustee asserts that the Court has personal jurisdiction over Grupo based on Grupo's receipt of power of attorney from MP Corporation for MP Corporation's approximately 31% interest in Grupo.  The Trustee does not explain, and the Court does not see, how receipt of power of attorney for stock in a Mexican corporation gives the Court personal jurisdiction over the Mexican corporation.

Similarly, the Trustee does not explain, and the Court does not see, how the Court can exercise personal jurisdiction over Palatina and Flaminia.  Palatina and Flaminia are Mexican corporations.  The Trustee's assertion of personal jurisdiction over Palatina and Flaminia is limited to a promissory note Palatina allegedly executed in favor of Romero.  The note was secured by Flaminia stock.  The note's only relation to the present adversary proceeding is that the note was offered by Romero as collateral securing a promissory note between North Sea, AFL, and Romero.  Palatina may have purposefully transacted with Romero, but there is no evidence that Palatina ever purposefully transacted with the Interamericas Companies or any other Texas entity.  Flaminia's contacts, limited to its stock securing the Palatina note, are even further removed from Texas.  Accordingly, the Trustee has not shown by a preponderance of the evidence that Palatina and Flaminia had contacts with Texas sufficient for this Court to assert personal jurisdiction.

### 2. *Romero*

Romero's contacts with Texas are sufficient to establish personal jurisdiction.   His contacts are insufficient to establish *general* personal jurisdiction.   Nevertheless, the Court has *specific* personal jurisdiction over Romero based on the contacts of Romero's agent and Romero's direct contacts  with Texas.

### i. Absence of General Personal Jurisdiction

When a defendant's contacts are "continuous and systematic," a court may exercise general jurisdiction over any action brought against that defendant, even if the action is unrelated to  the  defendant's  contacts  with  the  forum.   *Seiferth*, 472 F.3d at 271.   The evidence demonstrates that Romero's direct contacts with the United States were sporadic and insufficient for general personal jurisdiction.

Though Romero may have been a substantial investor in the Interamericas Companies, general  jurisdiction  does  not  exist  based  on  passive  investment  in  a  corporation.  *Constr. Aggregates, Inc. v. Senior Commodity Co., S.A.M.*, 860 F. Supp. 1176, 1180 (E.D. Tex. 1994) (citing *Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1559 (3rd Cir. 1994)). Romero may have  received  funds  from  an  Interamericas  Companies'  Texas  bank  account.   However,  the receipt of funds from a forum-state bank account "is of negligible significance" for determining personal  jurisdiction.  *Helicopteros*,  466  U.S.  at  416–417.   Romero's  contacts  were  not continuous and systematic and therefore do not confer general jurisdiction over Romero.

### ii. Presence of Specific Personal Jurisdiction

Romero's participation in the fraud, denuding, and fraudulent transfer claims asserted by the Trustee would be sufficient for specific personal jurisdiction limited to those claims. *Lewis v. Fresne*, 252 F.3d 352, 358–59 (5th Cir. 2001) ("A single act by a defendant can be enough to

confer personal jurisdiction if that act gives rise to the claim being asserted."); *Brown v. Flowers Indus.*, 688 F.2d 328, 332–33 (5th Cir. 1982) (holding that personal jurisdiction existed over defendants whose contacts were limited to mail and telephone communications made with an intent to defraud). However, the merits of the fraud, denuding, and fraudulent transfer claims have not yet been decided.  Accordingly, assertion of specific personal jurisdiction based upon Romero's involvement in the Trustee's fraud, denuding, and fraudulent transfer claims is not proper at this stage in the litigation.

Nonetheless, the Court has personal jurisdiction over Romero on two basis: the contacts of Romero's agent, and the aggregation of Romero's own direct contacts.

### a. The Agency Relationship

The Court finds that Enrique was Romero's agent.  An agent's acts are imputed to the principal for the purposes of specific personal jurisdiction.   Enrique Pimienta represented Romero's interests in the Interamericas Companies through Enrique's position on the Advisory Board.  Enrique Pimienta's contacts with Texas, in his capacity as Romero's agent and as an Advisory Board member, were extensive.  The extensive contacts are sufficient to create specific personal jurisdiction over Romero.

A grant of power of attorney creates an agency relationship between the principal granting the power and the agent authorized to exercise the power. *In re Cantrell*, 88 F.3d 344, 346–47 (5th Cir. 1996); *Int'l Strategies Group, Ltd. v. Greenberg*, 482 F.3d 1, 7–8 (1st Cir. 2007).

Romero gave Enrique Pimienta power of attorney to act on Romero's behalf personally, and with respect to corporate Defendants owned by Romero.  The parties dispute when the power was granted, the scope of the power, and when the power was terminated.  The Trustee

alleges that Romero gave Hugo and Enrique Pimienta power of attorney to vote his shares on the Interamericas Companies' Advisory Board.  Romero denies that any such power of attorney was granted.  Furthermore, Romero contends that, as a matter of law, an individual can not grant another power of attorney to act for the principal on a company's board of directors.

Based on the evidence before the Court, the Court concludes that Romero gave Enrique Pimienta full power of attorney in the early 1980's.  In a deposition, Romero acknowledged that with respect to corporate Defendants Romero owned, "I gave him all power of attorney or powers in authorities and he managed everything without asking me anything." Romero also stated that with respect to the personal power of attorney, "I gave him or I granted him all powers in authorities."

Romero and Enrique first met in the mid 1970's and developed a relationship of trust. Enrique was an accountant and provided accounting services for Romero's Mexican businesses during the 1970's and 1980's.  In the mid 1980's, Enrique began providing investment advice. Near this time, Romero also granted Enrique his general power of attorney.  The power of attorney was limited in the mid 1990's but did not terminate Enrique's exercise of authority with respect to Romero's involvement with the Interamericas Companies.  The limited power of attorney was terminated in late 2001 or early 2002.  Romero also granted Enrique power of attorney to act on behalf of many of the corporate Defendants owned by Romero.  That power of attorney was also terminated between 2001 and 2002.

Additionally, a principal-agent relationship between Romero and Enrique also arose independent of the power of attorney agreement.  A written and signed contract is not necessary to create a principal-agent relationship.  Williston has stated:

"There is no particular mode or method which must be adhered to in order to create or establish agency.  Regardless of the terms used by the parties, or by what name the

21

transaction is designated, if the facts fairly disclose that one party is acting for or representing another, by the latter's authority the agency exists."

WILLISTON ON CONTRACTS, §35:1 (4th ed. 1999) (citing RESTATEMENT (SECOND) OF AGENCY § 15, (2nd ed. 1958).

There was convincing testimony that Romero directed Enrique to undertake actions related to Interamericas Companies' business on Romero's behalf, and Enrique generally served Romero's interests. Romero and Enrique frequently met to discuss Interamericas Companies' business. Romero gave and Enrique executed directions with respect to Interamericas Companies' management. Romero's directives occurred frequently, extended over a period of years, and implicated Romero's Interamericas Companies and Mexican business interests. Such conduct creates a general principal-agent relationship. "The relation of principal and agent may be created by manifestations of assent of the respective parties in any way." WILLISTON ON CONTRACTS, §35:1 (4th ed. 1999) (citing RESTATEMENT (SECOND) OF AGENCY §§ 15, 26 (2nd ed. 1958). Romero and Enrique's decade-long business relationship, involving numerous power of attorney agreements and express orders, evidenced sufficient manifestations of assent to create an agency relationship.

### b. Agent's Acts Imputed to the Principal

The Supreme Court has held that "when commercial activities are 'carried on in behalf of an out-of-state party those activities may sometimes be ascribed to the party, at least where he is a 'primary participant' in the enterprise and has acted purposefully in directing those activities." *Burger King Corp.*, 471 U.S. at 480, n.22 (citing *Int'l Shoe Co.*, 326 U.S. at 320; *Calder v. Jones*, 465 U.S. at 790); *Daynard v. Ness, Motley, Loadholt, Richardson & Poole*, 290 F.3d 42, 55 (1st Cir. 2002) ("For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal."); *Pieczenik v. Dyax Corp.*, 265 F.3d 1329, 1335 (2d Cir. 2001)

("activities conducted by in-state party are not attributable to an out-of-state defendant unless the in-state party is regarded as an agent of the defendant"); *Grand Entm't Group, Ltd. v. Star Media Sales, Inc.,* 988 F.2d 476, 483 (3d Cir. 1993); *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990); *Williamson v. Petrosakh Joint Stock Co.*, 952 F. Supp. 495, 498 (S.D. Tex. 1997) ("Actions by an agent can be used to establish jurisdiction over the principal."); *Coleman v. Klockner & Co. AG,* 180 S.W.3d 577, 588 (Tex. App.—Houston[14th Dist.] 2005, no pet.) ("An agent's contacts can be imputed to the principal for purposes of the jurisdictional inquiry.").

### c. Enrique's Acts

Enrique's contacts with the United States (and Texas, in particular) as a member of the Interamericas Companies' Advisory Board and as an agent of Romero, were extensive. Enrique Pimienta was one of five members of the Interamericas Companies' Advisory Board. The Board made all significant business decisions affecting the Interamericas Companies.[6] Among other management decisions, the Advisory Board determined rates of returns to be paid on investment vehicles, decided where capital investments were made, and authorized all transfers from the Interamericas Companies' Texas bank accounts. The Advisory Board also approved the transfers discussed in this opinion and that form the basis for the Trustee's fraud, denuding, and fraudulent transfer claims. Such contacts, carried out by Enrique Pimienta while serving on the Advisory Board, unquestionably give rise to specific personal jurisdiction over Enrique Pimienta with respect to the Trustee's claims. *See In re Teknek, LLC*, 354 B.R. at 198–200 (finding specific personal jurisdiction over corporate insiders who "established a limited liability company in [the forum state], used that entity to generate profits, used American banks as the

---

[6] The Interamericas Companies had officers and directors separate from the Advisory Board. However, the separate officers and directors only implemented the decisions of the Advisory Board. Directors and officers did not dispute directives given from the Advisory Board. If an officer or director did not implement a directive from the Advisory Board, that person would no longer be employed by the Interamericas Companies.

focal point for those funds, and then transferred all such funds through this focal point to themselves individually, leaving the limited liability company within the U.S. forum with virtually no money or assets to satisfy its creditors . . . ").

Additionally, Enrique took numerous and significant acts in Mexico, that were ultimately directed at the United States.  Enrique lived in Mexico until 2002 and often conducted Interamericas Companies' business from Mexico.  Enrique testified that Romero directed Enrique to enlist individuals to sign as "straw-men" for shell corporations.  Acts taken outside a forum but directed at a forum state can create personal jurisdiction in the forum state. *Calder v. Jones*, 465 U.S. 783, 789 (1984); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98 (1980); *Haisten v. Grass Valley Med. Reimbursement Fund*, 784 F.2d 1392, 1397 (9th Cir. 1986) ("purposeful availment is satisfied even by a defendant 'whose only "contact" with the forum state is the "purposeful direction" of a foreign act having effect in the forum state'").

The Advisory Board met in Texas at the Interamericas Companies' Texas headquarters. Transfers involved and/or affected Texas entities.  Many transfers approved by the Advisory Board and capital invested in the Interamericas Companies passed through Texas bank accounts. Enrique's actions as an Advisory Board member are imputed to Romero through their agency relationship.  Consequently, Romero is subject to personal jurisdiction in this forum.

### d. The Scope of Enrique's Agency Authority

Romero contends that Enrique's contacts can not be imputed to Romero because the acts were not authorized by the power of attorney agreement.  Romero contends that the power of attorney agreement was terminated prior to the contacts that form the basis of the Trustee's complaint.  Romero also contends that Enrique's acts were outside the authority granted by the

power of attorney agreement because the acts were not valid under the power of attorney agreement. The Court rejects both arguments.

Enrique's power of attorney remained in effect during the occurrence of many, if not all, the transfers that form the basis of the Trustee's complaint. Almost all of the Interamericas Companies' assets were siphoned off to various entities within a two year period, starting in late 1998. Even if Enrique's power of attorney was terminated prior to some disputed transfers, the personal jurisdiction analysis is not affected. The Court finds personal jurisdiction exists pursuant to authority resulting, in part, from the agency relationship created by the power of attorney. However, the fact that the power of attorney was terminated does not automatically result in termination of personal jurisdiction. Jurisdiction may still exist for causes of action that arise after the agent's authority is terminated when the cause of action relates to acts taken pursuant to valid agency authority and before authority is terminated. *Nowak*, 94 F.3d 708, 716 (1st Cir. 1996) (noting that personal jurisdiction analysis includes results of conduct when conduct "set[s] in motion a chain of reasonably foreseeable events resulting in" the tortious acts). A principal can not tell an agent to burn a forest and escape liability by withdrawing the agency relationship after the first tree begins to burn.

Romero also contends that Enrique's contacts can not be imputed to Romero because Enrique's power of attorney did not extend to Enrique's acts taken as an Interamericas Companies' Advisory Board member. A Mexican law expert testified that Enrique could not act pursuant to the power of attorney without complying with a certification procedure. The Mexican law expert also stated that, after 1994, Enrique could not act pursuant to the power of attorney without written authorization from Romero or Romero's son, Serjio Julio Romero Silva.

Romero also notes that Enrique admitted that his power of attorney did not extend outside of Mexico.

Romero and Enrique's power of attorney agreement is relevant in more than one respect. Romero's arguments based on the Mexican law issue would be relevant to a claim that Enrique's acts are not binding on Romero because they were not authorized by the power of attorney agreement.   However, the question before the court is not whether the power of attorney agreement makes Romero liable for Enrique's conduct.   The question before the Court is whether Enrique's acts can be attributed to Romero for specific personal jurisdiction purposes. For personal jurisdiction purposes, the power of attorney agreement is relevant not for establishing which acts can and can not be binding on Romero because they were or were not authorized by the power of attorney agreement.   Rather, the power of attorney agreement is relevant for establishing a principal-agent relationship.

Enrique and Romero had a principal-agent relationship.   The agreement, though limited in the mid 1990's, continued through the period during which the disputed transfers occurred. This agreement created a principal-agent relationship. *In re Cantrell*, 88 F.3d 344, 346–47 (5th Cir. 1996); *Int'l Strategies Group, Ltd. v. Greenberg*, 482 F.3d 1, 7–8 (1st Cir. 2007).   As discussed earlier, Romero and Enrique's relationship *outside* the power of attorney agreement also created a principal-agent relationship.

The technical defenses raised by Romero might be relevant if the dispute before the Court were whether Romero was bound by an agreement made by Enrique Pimienta on Romero's behalf.   But, whether the agreement was legally enforceable is not the issue before the Court. The agreement was acted upon and was relied upon by Romero, Enrique Pimienta and the Advisory Board.   The actions taken pursuant to the agreement—whether technically authorized

or not—were intended to occur by Romero.  His actions were directed into this forum; he is subject to specific jurisdiction for the consequences of those actions.

Testimony indicated that the acts that lead to the transfers that form the basis of the Trustee's complaint were not undertaken by Enrique on his own volition.  Rather, Enrique undertook the acts pursuant to express direction from Romero.  Agent actions, undertaken pursuant to a principal's express order, are attributable to the principal under general agency principals.  RESTATEMENT (THIRD) OF AGENCY § 7.04 (2006). Express orders from a principal creates actual authority to act on behalf of the principal. *Pasant v. Jackson Nat'l. Life Ins. Co.*, 52 F.3d 94, 97 (5th Cir. 1995) ("Actual authority includes both express and implied authority. Express authority exists 'where the principal has made it clear to the agent that he wants the act under scrutiny to be done.'") (quoting *City of San Antonio v. Aguilar*, 670 S.W.2d 681, 683 (Tex. App. 4 Dist. 1984)). There are no agent acts more clearly binding on the principal than acts taken pursuant to express authority.[7]  Because general agency principals impute agent conduct taken pursuant to a principal's express order, the conduct at issue did not need to be taken pursuant to the written power of attorney.

During oral argument, questions were raised as to whether Enrique's authority to act on Romero's behalf was limited to acts authorized by and taken pursuant to the power of attorney agreement.  The Court does not find any legal or factual basis supporting this contention.

---

[7] Enrique's actions that were not expressly ordered by Romero may also be binding on Romero.  Actual authority includes implied authority. *Pasant*, 52 F.3d at 97.  Implied authority can arise: "(1) from some indication from the principal that the agent possesses the authority; (2) from being the necessary implication of an expressly authorized act; and (3) from a pervious course of dealing." *Id.* (citing *Wells Fargo Business Credit v. Ben Kozloff, Inc.*, 695 F.2d 940, 945 (5th Cir. 1982), *cert denied*, 464 U.S. 818 (1983); *Texas Conservative Oil Co. v. Jolly*, 149 S.W. 2d 265, 267 (Tex. Civ. App.—El Paso 1941). Based on the power of attorney agreement and frequent directions from Romero, Enrique may have had implied authority to undertake actions on Romero's behalf that were not expressly authorized.

Limiting authority in a power of attorney agreement does not insulate a principal from agent actions not within the power of attorney agreement but nevertheless expressly authorized by the principal.  The limits of the power of attorney agreement may be a plausible defense if Enrique had acted beyond the limits of the agreement on his own volition.[8]  However, acts undertaken by Enrique that exceeded the bounds of the power of attorney agreement were taken *pursuant*, not contrary, to Romero's express direction.  Romero cites no authority suggesting that a power of attorney agreement can insulate a principal from acts of an agent that exceed the scope of the power of attorney agreement but that are nevertheless expressly authorized by the principal.

Romero also contends that Enrique's power of attorney was invalid with respect to the Interamericas Companies' conduct because a director may not grant another a power of attorney to serve in their place as a director.  This defense is largely irrelevant.  The issue on personal jurisdiction is not whether the power of attorney was used in accordance with Texas law.  The issue is whether Romero—in executing the power of attorney—could reasonably expect to be haled into a United States forum court.  Romero may be able to assert this issue as a substantive defense to the complaint against him.  However, it does not serve as a defense to the question of personal jurisdiction.[9]

---

[8] Even if Enrique's acts that exceeded the power of attorney agreement were not expressly authorized by Romero, Romero may nevertheless be bound under principals of apparent authority or estoppel. *Alterman v. Lydick*, 241 F.2d 50 (7th Cir. 1957); *Phillips Petroleum Co. v. Buster*, 241 (10th Cir. 1957).

[9] Defendants also note that a corporation's contacts with a forum state can not be attributed to corporate fiduciaries and investors for personal jurisdiction analysis. *Stauffacher v. Lone Star Mud, Inc.*, 54 S.W.3d 810, 815-16 (Tex. App.—Texarkana 2001, no pet.) ("The general rule is that a court may not assert personal jurisdiction over an individual based on the individual's relation to a corporation unless the corporation is the individual's alter ego."). However, personal jurisdiction over Romero does not arise based upon the Interamericas Companies' contacts. Corporate shield doctrines are inapplicable in this case.  The Trustee's suit does not involve a third-party attempting to impose liability on a director by piercing the corporate veil.  In the Trustee's suit, the corporation itself, through the Trustee, is bringing suit.  Corporate veil doctrine has no application where the corporation itself sues an officer for that officer's individual conduct.

*e. Specific Personal Jurisdiction Based on Romero's Direct Acts*

Although the Court principally finds jurisdiction based on Romero's agency relationship with Enrique, the Court alternatively finds that Romero's non-agency contacts with the United States are also sufficient to establish specific personal jurisdiction.  Romero participated in substantial transactions in the United States through his dealings with the Interamericas Companies.

Business transactions may be considered for personal jurisdiction analysis. *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 105 (2nd Cir. 2006) (finding specific personal jurisdiction over investors based on executing brokerage account agreements and stock trades with plaintiffs in the forum state). Romero invested tens of millions of dollars in the Interamericas Companies. Romero contends that his investments should not be considered at all because the investments were in off-shore companies, not the United States.  The Court recognizes that when a publicly-traded company invests in a particular forum, courts ordinarily can not assert personal jurisdiction over an ordinary investor of the publicly traded company based on the company's forum investments.  However, Romero was no ordinary investor and the off-shore companies were not ordinary companies.

The Interamericas Companies consisted of approximately 19 entities.  Some entities were incorporated in the United States.  Some entities were incorporated abroad.  However, all entities were controlled by the Interamericas Companies Advisory Board sitting in Texas.  The Advisory Board controlled the investments.  The Advisory Board established the shell companies Romero contends held his investments.  Funds going into and out of the shell companies passed through the Interamericas Companies' Texas bank accounts. The shell companies did not have

independent boards or managers.  Rather, from all accounts, all Interamericas Companies were controlled by the Advisory Board.

Romero's investment communications and transactions were through Advisory Board members or shells created by Advisory Board members.[10]  Moreover, Romero admits that his investments were transferred to a Texas Bank account.[11]  Investments were not made directly to a particular off-shore entity and Romero and the Advisory Board apparently never intended to treat investments in any individual entity separate from the Interamericas Companies generally. The investments were ultimately made in U.S. entities.  Romero was aware of this.  Indeed, the admitted purpose of the Interamericas Companies was to provide an investment vehicle by which Mexican nationals could invest in the United States.  Consequently, regardless of where Romero's investments may have been distributed or held at any particular moment, the investments were ultimately made with the Interamericas Companies and directed at this forum. The Interamericas Companies was an organization based in Texas.

In addition to the investments, Romero, on behalf of corporations owned by him, signed numerous loan, security, and restructuring agreements that were executed in Texas, provided that the agreements' terms would be governed according to Texas law, and consented to Texas and United States jurisdiction.  Romero made substantial communications with Interamericas Companies Advisory Board members through personal visits to Texas and the United States, and telephone communications made in Texas and the United States.  Romero received substantial sums from the Interamericas Companies' Texas bank accounts.  Testimony established that

---

[10] Romero "admits that he invested millions of dollars with insiders of the Debtors, being Enrique Pimienta and by extension with his son Hugo Pimienta . . ." Defendants' Emergency Motion to Dismiss, p. 3 (docket no. 93). Romero further states that "he never received any stock certificates, CD's or bearer notes or anything else that explained to him or established that he was a shareholder or an investor in the Debtors *or any of their subsidiaries, parents, or affiliates.*" (emphasis added).  Romero's earlier Motion to Dismiss also states " . . . Romero made investments in the United States . . .). Responding Defendants Motion to Dismiss, p. 7 (docket no. 34).

[11] Responding Defendants' Motion to Dismiss, p. 5–6 (docket no. 34).

Romero knew that Interamericas Companies' decisions would be made in Texas, and that the Interamericas Companies' investments would be in Texas and the United States. Although this conduct is insufficient to establish general jurisdiction, the contacts all relate to conduct occurring within the Interamericas Companies that forms the basis of the Trustee's specific claims. Romero's substantial participation in the Interamericas Companies' affairs was purposeful and of a nature that Romero should have perceived that he could be obligated to defend his conduct in a United States Court.

Romero contends that Romero's individual contacts are insufficient to support finding specific personal jurisdiction. Romero may be correct that any individual contact, standing alone, would be insufficient to establish specific personal jurisdiction. However, the Court does not reach its conclusion based on any individual act. The Court considers Romero's forum contacts in the aggregate. Aggregating forum contacts related to the same cause of action is proper for specific personal jurisdiction purposes.

Romero argues against aggregating individual contacts based on the Fifth Circuit's opinion in *Seiferth v. Helicopteros Atuneros, Inc.* 472 F.3d 266 (5th Cir. 2006). Romero misconstrues *Seiferth*.

*Seiferth* considered whether specific personal jurisdiction over one claim in a multi-claim suit was sufficient to attach specific personal jurisdiction over other claims arising from contacts occurring in a different forum. *Id*. In *Seiferth*, the plaintiff brought four claims against the defendant. *Id*. at 274. One claim was based on contacts within Florida. Three claims were based on contacts within Mississippi. *Id*. The plaintiff contended that the Mississippi court had specific personal jurisdiction over the claim that arose in Florida based on the claims that arose in Mississippi. *Id*. The Fifth Circuit held that specific personal jurisdiction is a claim-specific

31

inquiry. *Id*. at 274. Claims can not be aggregated for specific personal jurisdiction purposes. Specific personal jurisdiction over one claim in a multi-suit claim does not automatically create specific personal jurisdiction over all other claims within the suit. *Id*. Rather, plaintiffs must establish sufficient contacts for each individual claim. *Id*. *Seiferth* never suggested that individual contacts within the forum and related to the same claim should not be aggregated for purposes of determining specific personal jurisdiction over that claim.

In essence, personal jurisdiction protects a defendant's due process right to not be forced into a court unless the defendant's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into the court there." *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980). A party's reasonable anticipation of being haled into a forum's courts is not necessarily affected by contacts occurring in a different forum. If a repairman negligently repairs a good in Texas, the repairmen should expect to be haled into a Texas court. If the same repairman commits a battery in Wisconsin, the battery in Wisconsin should not affect his forum expectations with respect to Texas. Consequently, non-forum contacts should not be considered with forum contacts when considering specific personal jurisdiction over a claim.

However, separate instances of conduct within the same forum and relating to the same cause of action would affect a party's reasonable anticipation of being haled into a court of that forum. Torts have elements. A party does not commit a tort unless all elements of that tort are established. Often, different elements require separate acts.

The present case involved multiple claims. However, the Trustee does not contend and the Court does not determine that the Court has specific personal jurisdiction over all claims because the Court has specific personal jurisdiction over one claim. The Court considers each

claim individually.  The Court considers *contacts* in the aggregate.  The Court's determination of specific personal jurisdiction is based on *all* Romero's individual acts considered in tandem. Unlike the contacts at issue in *Seiferth*, each contact occurred in Texas and each claim arose from the same aggregate of contacts.

Romero had numerous contacts within the U.S. related to the transfers to and from the Interamericas Companies that form the basis of the Trustee's complaint.  Moreover, these contacts were not made in normal business circumstances.  The contacts were made with an entity rapidly losing money through transfers to the Interamericas Companies' insiders and important investors.  Under these circumstances, Romero can not reasonably contend that it would be unreasonable to anticipate being haled into a Texas court.[12]

### f. Contacts Support Each Claim

A Court's specific personal jurisdiction is limited to causes of actions that arise out of the defendant's contacts with the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985). Romero asserts that, with the exception of the North Sea transfer, the Trustee has not shown that each cause of action *individually* arose out of the defendants' contacts. "A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006). Romero describes each transfer noted in the Trustee's complaint and contends that, with the exception of the North Sea transfer, Romero had no involvement.

Though the Trustee asserts multiple claims against Romero, the claims do not arise out of different forum contacts.  The Trustee's causes of action arise from Romero's involvement with

---

[12] Romero also objects to the Court's statement that "Romero participated in substantial transactions in the United States through his dealings with the Interamericas Companies." Romero contends that the statement is not supported by the evidence.  The statement refers to the aggregate of Romero's individual dealings with the Interamericas Companies, including his investments, execution of documents, communications, and receipt of funds.  Those individual dealings were supported by testimony and documents admitted at the evidentiary hearing.

transfers to and from the Interamericas Companies entities. The entities were controlled by the Interamericas Companies' Advisory Board. Abundant testimony established that no transfers were made without the approval of the Advisory Board. Enrique served on the Advisory Board. Enrique was Romero's agent. Enrique's contacts are imputed to Romero. Consequently, each cause of action "arise[s] out of or relate[s] to" Romero's activities directed to the forum. Romero had sufficient "minimum contacts" to create specific personal jurisdiction in this Court over each claim.

*In re Tekneck, LLC*, 354 B.R. 181 (Bankr. N.D. Ill. 2006) involved a similar personal jurisdiction question. The Trustee sued insiders of a LLC based on allegations that the insiders siphoned off all the LLC's assets for their personal benefit. *Id*. at 189. The Trustee's complaint contained four causes of action. *Id*. The first cause of action was for fraudulent transfers. Numerous transfers were involved. *Id*. The court noted:

> Although we could go through an elaborate survey of Kennett and Hamilton's connections with this forum through the debtor, we need focus on one discrete set of uncontroverted facts: Kennett and Hamilton established a limited liability company in Illinois, used that entity to generate profits, used American banks as the focal point for those funds, and then transferred all such funds through this focal point to themselves individually, leaving the limited liability company with the U.S. forum with virtually no money or assets to satisfy its creditors as disclosed in the bankruptcy-petition schedules.

*Id*. at 198. Consequently, the Illinois Court held personal jurisdiction existed over all the Trustee's complaints. *Id*. at 198–203.

### C. Fair Play and Substantial Justice

In addition to "minimum contacts," the Trustee must demonstrate that this Court's exercise of specific personal jurisdiction over the Defendants would be consistent with notions of "fair play and substantial justice." *Burger King Corp.*, 471 U.S. at 476; *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994) ("If a nonresident defendant has sufficient related or unrelated minimum

contacts with the forum, we must then consider whether the 'fairness' prong of the jurisdictional

inquiry is satisfied.").  Fairness and substantial justice are evaluated by considering five factors:

> (1) the burden on the defendant;
> (2) the forum State's interest in adjudicating the dispute;
> (3) the plaintiff's interest in obtaining convenient and effective relief;
> (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and
> (5) shared interest of the several States in furthering fundamental substantive policies.

*Burger King Corp.*, 471 U.S. at 478 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S.

at 292); *Wilson*, 20 F.3d at 647. Defendants challenging jurisdiction bear the burden of proving

unfairness. *Burger King Corp.*, 471 U.S. at 477.  The burden is not light.  The defendant "must

present a *compelling case* that the presence of some other considerations would render

jurisdiction unreasonable." *Id.* at 477 (emphasis added).

Romero alleges that litigating in Texas would be unfair because of his personal

circumstances.  Romero is a Mexican national residing in Mexico.  He is unfamiliar with U.S.

laws and procedures.  He is over 70 years old.  Defendants' counsel also asserts the majority of

documents and witnesses reside in Mexico.

Defendants have not presented a "compelling case" that exercise of this Court's

jurisdiction would be contrary to notions of "fairness and substantial justice."  Several

Defendants consented to Texas court jurisdiction through the loan agreements discussed earlier.

Romero has frequently traveled to Texas and throughout the United States.  Testimony indicated

that Romero visited Interamericas Companies' Advisory Board members on several occasions.

Romero has offered no evidence of illness or other conditions suggesting travel would be unduly

burdensome.  Contrary to Romero's contentions, documents and key witnesses are in the United

States. The language barrier is significant.  However, the barrier will either exist with respect to

the Trustee or Romero.  The Court notes that Romero is very ably represented by bilingual counsel.  The Court intends to accommodate the language barrier issues.  This factor does not present a compelling justification.

Moreover, the forum's interest in adjudicating the present dispute strongly favors the fairness of this Court's jurisdiction.  The Trustee's adversary proceeding was brought pursuant to federal bankruptcy laws and within a federal bankruptcy case. The United States has a substantial interest in enforcing its laws. *In re Teknek, LLC*, 354 B.R. at 204 ("The adjustment of the debtor-creditor relationship is a federal concern, 28 U.S.C. § 157(b)(2)(O), and one of the policies underlying the substantive law in this area is the notion that a single federal forum ought to have the power to bring before it all matters with respect to a single bankruptcy debtor so that all such matters may be handled more efficiently, consistently, and expeditiously than if they were scattered throughout various courts.").

Defendants have not meet their burden of presenting a compelling case demonstrating that it would be unfair and unjust for this Court to exercise personal jurisdiction over the Defendants.

### Conclusion

The Court denies the Defendants' motion to dismiss for lack of personal jurisdiction with respect to Romero, Minerva, Mar Sur, South Sea, North Sea, Pacific, and Larce.  The Court grants the Defendants' motion to dismiss for lack of personal jurisdiction with respect to Grupo, Palatina, and Flaminia.  A separate order will be issued.

Signed at Houston, Texas, on July 15, 2008.

MARVIN ISGUR
United States Bankruptcy Judge